Good morning, Your Honors, and may it please the Court. The record evidence requires reversal of District Court's grant of summary judgment dismissing Mr. George's claims for premises liability and products liability. I want to begin by directing your attention to three citations which demonstrate the key questions of fact in this record. First, at pages 36, 61 to 68 of the record, you have the testimony of T.K. Hall, who is the SI Group employee who issued the permit at issue, and admitting that he recognized that the staging area would collapse within four to ten minutes if a trailer was decoupled there, uncoupled there. Two, that SI Group is supposed to make sure the ground is solid. That's SI Group's responsibility. And three, that the unstable condition should have been noted on the permit. This testimony creates a fact issue on SI Group's knowledge of the pre-existing condition. Did he direct – did he testify that they directed Viola to the staging area? Yes, they did direct Viola to the staging area. That is correct. The second citation I'd like to direct your attention to is at 3685, which is again Mr. Hall, where he acknowledges that Viola was never told not to uncouple the trailer. Nobody ever told him that. And also at 4167, which is the testimony that there was nothing, there was no written document telling Viola that they could not uncouple in the staging area. Nothing says that in the record. So this is important because this evidence demonstrates that SI Group was – and because the evidence demonstrates that SI Group was routinely staging the trailers there, and without matting, on the gravel, and that they'd actually done it that morning. But doesn't that still turn on the water and the leak, right? Because it's pretty open and obvious you shouldn't, one of these enormous things, uncouple it on gravel. No, I don't think it's open and obvious, Your Honor, and I'm happy to address that now if you would like. Oh, no, keep going. These record sites are very helpful. So those are two. You said you had a third? And the third one is at 9717. This is the CDL handbook, and this goes to Brenner's claim that you can't uncouple trailers. And I cite that record site because nothing in the CDL handbook says anything about uncoupling trailers or using matting. What that talks about is level surfaces and making sure the ground is solid, which is exactly what Mr. Armstrong did. It doesn't talk about matting, and it doesn't talk about uncoupling. So I'll get to that point when we get to the Brenner issue, but I'll pick up where you started with the premises defect claim. What was the remand? Was it a type one, type two, or both? I'm sorry? The remand from the prior decision. Oh, on which claim? Yes. It was on both claims, I believe. It was just whether we had pleaded a premises defect or not. And actually, now that you're asking that question, I believe that the case was originally phrased as a preexisting defect, and then it's been met with the argument that it's a activity defect. Because the instance is 10 years old, and we're reviewing Judge Tipton's order, which reversed Judge Hughes's order. Yes. And you had three separate opinions from our court four years ago. Yes. So I was just trying to clarify what our court thought should happen on remand. Yeah, that opinion was based upon just what the pleadings and what the basic evidence was showing at the time. And Judge Hughes, you know, denied summary judgment. Judge Tipton grants a summary judgment. So we're back here again. But to answer your broader question, I believe we have evidence to proceed on both a premises preexisting defect claim as well as an activity defect claim. I think the record supports both. So beginning with the preexisting defect, the question is whether they had knowledge or actual knowledge of the defective condition. And the record is full of evidence of this. The defective condition, of course, just to clarify, I think this gets to the point you were asking a minute ago. The defective condition is the unstable ground. By virtue of the water or just because it's gravel? By virtue of the instability in the surface. Yeah, the virtue of the fact that this ground is something that they knew could not withstand uncoupled trailers but could withstand coupled trailers. That is not an open and obvious defect. I think what you're probably hinting at is some of the plain dirt cases. And what I'd like to talk about right there is this is not a plain dirt case, because first of all, this is plain dirt. This is not some grass in a field or just that turns into mud. You can't see the mud. This is gravel. This is rock. That routinely holds chemical tankers that weigh thousands of pounds with trailers, which a chemical trailer plus a tractor is going to weigh even more. So it routinely holds that stuff. And you would never actually drive a tractor trailer on plain dirt. You would never do that. What you have here is a system that's designed for that. But what was not disclosed was the fact that underneath that ground or that ground was stable enough for one activity, which seems to hold a lot of weight, but not stable enough for another activity. And the cases I would point you to on this would be EI DuPont versus Roya, which is cited in the briefing. And it's actually cited often for the proposition about knowledge. But the prior holding in Roya is that the erosion of the subsoil beneath the surface created an unsupported ledge. So in Roya, you had topsoil, but the soil underneath it had been weakened. And because that had been weakened when he stepped on the topsoil, which looked stable, collapsed. That was not a plain dirt case. That was a hidden defect, a concealed hazard. The issue in that case was that nobody knew about it. The other case I would point you to is Guidry versus Natchez Butane Products Company. This is from the Texas Supreme Court in 1972. A citation for that is 476 Southwest 2nd at 666. And in that case, the Texas Supreme Court reversed summary judgment where the work had a hidden weight, the work area had a hidden weight bearing weakness in the surface soil. And what the evidence was there was that the surface was covered in shell, and it looked firm. And to the witnesses, it looked like concrete. And they were told that it was, it was quote, finished soil is what it was called. And earlier in that day, they had seen heavy equipment moving on the shell, not even leaving tire tracks. And what had happened then is they put a crane on it, and it collapsed. And the Texas Supreme Court held that there was a fact issue about whether that was a concealed defect and whether that was known or not to the plaintiff at the time. So that's the cases. And that case is in your brief? That case is not in our brief. That's additional authority. Could you give the site again? Yes, absolutely. That is 476, Southwest 2nd, 666. That's the Texas Supreme Court from 1972. So just bear with me, the argument, your argument is lucid. And so the plain dirt cases are distinguishable because there was a hidden hazard. And the hidden hazard here was what? That the ground that appeared stable on top was not actually stable. By virtue of what? By virtue of how it was constructed. I mean, there's evidence. So not, this isn't the leak. There's evidence of rain. There's evidence of a leak. There's evidence of rain plus a leak. But the bottom line is that it wasn't stable. And the case I have for that is also the Texas Supreme Court, which says that when you're looking at an unreasonably dangerous condition case, the question is the condition, not what caused the condition. So it's not, is this sprite on the floor? Did somebody spill a Coke can or was the sprinkler system blinking? The question is whether the floor was too slippery. Same question here. It's not whether it was a leak or the rain or the combination or if it was just built wrong. The issue is that this ground, which holds chemical tanks and big trucks, was not stable enough. It was stable enough for that, but not stable enough for this other thing, which is the uncoupled trailers, which they knew, that's the other point, is that they knew that you couldn't uncouple the trailer, even though you could have these on the tractor and the trailer together. And which kind of goes to a bigger point that we have here, which is that the testimony is that if it was this weak, if it was so weak that it couldn't hold an uncoupled trailer, they shouldn't have been doing anything on it. Cardona, who was the foreman, says that if you can't hold an uncoupled trailer, we don't want our trailers on there. That's something you should have told us about. And that's what the evidence shows, is they admit, the SI group admits that they inspect the ground, and they're supposed to inspect the ground, and that they did not find this weakness, and they admit that it should have been on the permit. That is T.K. Hall's testimony at 3668 at page 79, and there's a lot more along those lines. They know, they knew that they could not hold an uncoupled trailer. They did not warn Veolia of that issue, and they admit that it should have been on the trailer. That is knowledge of a pre-existing... I thought the record reflected that there were uncoupled trailers in the staging area. Absolutely. The record reflects that there was uncoupled trailers on the staging area that morning. Right. That's what Mr. George saw, and Veolia didn't, or SI group did not say anything about that. They didn't say you shouldn't be doing that, or we got to fix that. So they had noticed that this could happen, which goes, which that's the element of what is an unreasonable risk. Is it that a harm like this could occur, and did they have knowledge of the defect that this sort of harm could occur? They have knowledge. They knew the uncoupled trailers would collapse in four to ten minutes. That's Mr. Hall, and they knew that there was one there that morning, and... Uncoupled trailers, Hall says they would sink in, or the dolly leg would break. No, Hall said that he knew that if an uncoupled trailer was staged on the gravel, it would sink within four to ten minutes. He knew that, and that's confirmed by Gary Tragtory, who is SI group's site director, who also said that these could not hold uncoupled trailers, but could hold coupled trailers. So we're talking about the only people who knew that you couldn't put an uncoupled trailer there was SI group, which makes sense because they're the property owner, and that's why there's an obligation on them to warn of pre-existing conditions that the contractor would not know about. I'm happy to keep talking about this, but I can also turn to contractual control if we have questions about that, because the contractual control is just as easy to us, and what contractual control shows is that... I guess, yes, a but-for cause, the instability of the ground, clearly, but approximate cause, even when Armstrong doesn't use mats? Well, there's no evidence that they were told to use mats by Viola, and the evidence shows... I thought your experts both said mats are used. Our expert says mats would have stopped the incident, and there's some evidence that Viola sometimes uses mats, but this is where it gets to control, which is our second part of our premises defect claim. The testimony from Mr. Hall, and actually, you brought up the matting, so I'll go straight to it. This is at page 3665. He said that Viola did not have a choice on matting, and I'll read you this whole question and answer it. I think it's illuminating. Question. If SI Group doesn't require matting, would it be unfair to say that Viola should have had matting down? And T.K. Hall, who was the permit director, said, yes, that would be unfair, and the reason for this is that under the contract, under the permit procedures, under the hot washing storage tank procedures, and under the actual control of how things worked at the site, everybody agreed that SI Group had the say on where to go. SI Group was the one that said whether they used matting or not. Again, that's for Mr. Hall, which I just read you. That's confirmed by Mr. Derek Thomas, who is Viola's foreman superintendent, and he said, and he's pretty emphatic. I actually want to direct you to exactly this site because it's pretty emphatic in the testimony. It's at 3925 for Derek Hall, and he says, we only park where we are told to park. We don't make decisions on where to put the mats down or not to put the mats down. The decision is made before we even get there. The operations knows where we're supposed to park. Those are all decisions that are being made by SI Group, and the way you know this is all being made by SI Group, I'll point you to page 10-6000 of the record, which is their washing tank procedures, and the test for control is whether you have the power at a minimum to direct the order in which work is done or to forbid how work is done, and if you turn to page 1066, I don't expect you to have it in front of you, but I'll represent to you. If you go there, you will find this. SI Group's washing tank dictates each step of the tank procedure in order, in detail, down to how much water pressure they're supposed to use. They're supposed to use 75, 85 gallons per minute. They're supposed to fill the tank to two to three inches below the manway. They're supposed to, it tells them, first you do this, then while you're doing this, you set up the hoses. Then while you're doing that, you go, I mean, it goes step by step. And it says use mats? It does not say use mats. Does T.K. Hall say, we're the ones who use mats? T.K. Hall says, yes, if we said don't use mats, it's not, if we didn't say to use mats, it's unfair to say Viola should have used mats. That's page, I just read that, 3665. 36, that's sort of an odd phrase. If we didn't say, don't use mats? Well, the question was, if SI Group doesn't require matting, is it unfair to say they should have? And Mr. Hall said, yes, that would be unfair. So turning, but I want to go back to the washing procedure, though, on 10-6000, because it also says, it warns of hazards. It says, caution, hoses may cause tripping. That seems pretty obvious, but it's on there. It also says, caution, when backing up, must use a spotter. You don't have much time. Are you going to get to the design defect very briefly? Because the errors on the design defect are, I think, more service level, and I think they're more clear and they don't take as much time. On design defect, the question was whether they had conclusively established that Brenner, that there was a, whether Brenner established that this risk was a common knowledge in the industry. And all they point to is the handbook. What the handbook says, the site that they cite is, make sure surface of parking area can support the weight of the trailer. That's all it says. So the conclusion that all CDL drivers know that they have to use matting, or know that they can't go off of concrete, or anything beyond just checking that the surface is stable, is not common knowledge in the industry, and they have no evidence of that. And they are the ones, the burden on showing a no duty, they have the burden under Texas law. Usually, if there's a risky product, there's a duty. They have to affirmably I was actually asking about the design. Oh, I'm sorry, the design. My mistake. I misheard you. Yeah, the design, the design defects even more straightforward, which is that the whole basis of that holding was that there was only one product or one producing cause of the injury. I think the record, our record establishes there are other but for causes that if there had, if this design had been done differently, that would have also prevented the injury. So Texas law allows for more than one producing cause. I would cite the what's the evidence that the defect caused this injury? I'm sorry? What's the evidence that this evidence caused the injury? Well, the evidence is that if the, I mean, on page 11, 339, error expert degrees testified that the immediate cause of the accident was the failure of the soil to support the load, and that the larger pads and the narrow frame would have prevented it, because the larger pads would have stopped it from sinking, and the narrow frame, the large, the more spread out frame would have at least slowed it such that it wouldn't have sunk so far and it wouldn't have tipped. Okay, unless there's any other questions, you have time for rebuttal. Thank you, Your Honor. We'll now hear from Michelle Blair on behalf of SI Group. Good morning, Your Honors, and may it please the Court. I'd like to address two of the actual material issues regarding the premises defect case. First is properly categorizing what the defect was here, and it was not the ground. Second is the issue of control. To the first issue, the ground was not the defect. This is not a Category 1 case. This is a Category 2 case, and that is because we have undisputed testimony and an admission in plaintiff's reply brief, or in appellant's reply brief, that but for dropping the trailer on its legs in the gravel without the use of matting, the trailer would not have tipped. And a Category 1 defect has to be in existence prior to coming onto the property, and it has to be concealed. And a Category 2 defect is one that involves the activity of the independent contractor. What George Never has explained is how this trailer would have tipped but for the action of actually dropping it onto the gravel. At this time, it appears that George admits that but for causation actually is not the proper inquiry for identifying the premises defect, if that's what they raised in his reply brief. So I'd like to underscore that point, that it's not just every piece in the causal chain is a separate defect. Therefore, because the premises itself is involved in the causal chain, it's necessarily the defect. The definition of a premises defect is something that is unreasonably dangerous, that creates an unreasonable risk of harm, that a reasonable person would have foreseen that event or a similar event occurring. Here, there's two possibilities for the ground. As Judge Higginson was discussing, is it the ground itself or was it the leak underneath the ground? Our position is that neither one is the defect because in either scenario, whether there's a leak or there's not a leak, that trailer would not have tipped if it hadn't been dropped by Veolia's workers. But in addition, as we're as we're discussing, the ground itself cannot be a premises defect as a matter of law under Texas law because of the plain dirt doctrine. There's a long line of cases. It looked to me, I mean, you know, I write on the remand, the prior panel was remanding, was it remanding for both types of claims, inquiry into it, or is it really just remanding for the concealed leak issue? Or am I misunderstanding? Actually, the prior appeal concerned Chapter 95, and the holding of that panel was that Chapter 95 didn't apply, so it remanded for the district court to consider under the common law, which wasn't really focused on in the prior appeal. And so under the common law, you have this two-part inquiry, and that really wasn't addressed in the prior case. Okay, so both claims are before the court now. Well, they're not separate claims. It's a matter of properly categorizing. Did the defect exist when Veolia came onto the property? In which case, SI group's duty would depend on its knowledge. Or did the defect come into existence when Veolia dropped the trailer? In which case, SI group would owe no duty unless it controlled that decision. Okay, and then he gave three sites to T.K. Hall, because T.K. Hall, according to him, did seem to say SIG would have had to have warned. Yes, I'm a bit confused by what T.K. Hall's testimony is being used for now. It's been used for many things throughout this case, but at the end of the day, T.K. Hall's testimony just shows that everybody knew you're not supposed to drop a trailer on these tiny little legs in gravel without support. That was an open and obvious condition, or an open and obvious hazard, but the ground itself was not the hazard. In the Brownsville Navigation case from the Texas Supreme Court... So you're saying it's not really the uncoupling, it's not the failure to use mats, it's the actual dropping of the trailer? Well, the uncoupling and removing the tractor so that the 60,000 ton or pound trailer full of scalding hot water with the manhole open is sitting in gravel without any support. And three of George's own experts testified this accident wouldn't have happened if that hadn't been done, as did its corporate representative. Were there other tanks like that in the staging gravel area that were uncoupled? Is there evidence that there is? George is the only one in this extensive record who testified that he claims that he saw a trailer earlier that day in the same area for the same job. Assuming we take that testimony as true, which it's contradicted by tons of other testimony, but assuming that testimony is true and there's a trailer there, that tells us two things. One is that SI group wouldn't have had constructive knowledge of any danger, which Paul said, because there was another trailer there that didn't fall. There's no constructive knowledge of any danger. But more importantly, it goes to the issue of control. And there's a long line of Texas Supreme Court cases that says that it is not SI group's responsibility, the premises owner's responsibility to ensure that its independent contractors perform their work in a safe manner. And that includes when they see them doing something dangerous. Even if they see them doing something dangerous, the only thing that imposes a duty upon the owner in that situation is if they affirmatively approve or condone that behavior or that activity and they tell them go ahead and keep doing it that way. So if they see them wearing some fall safety equipment that turns out to be faulty and they say yes, wear that equipment, then that is exercising control. And that then would impose a duty upon them. And that's the JLB builders case versus Hernandez that says that it requires affirmative approval, even if you see a dangerous activity occurring on your premises. I'd like to also discuss the retained control aspect. So control, like I said, only matters if we're in a category two, which is where we are. So we're setting aside knowledge because knowledge doesn't matter. Control is what matters. And you can have two types of control, retained control and actual control. Retained control only arises from a contract. And none of the citations that you were provided was actually the contract that governs in this case. The contract is at page 2782 of the record. And that contract squarely places responsibility for taking safety precautions on Veolia and for ensuring the adequacy of its own equipment. And that's something else that's very important here is Veolia was not staging equipment when the accident happened. It was not working on the tank and cleaning when the accident happened. It was fixing its own tractor, its own equipment. And it made the decision how to do that, when to do that, and where to do that. Mr. Munoz testified that they could have emptied that tanker full of water first. They could have done the job first. Then there wouldn't have been any water to spill on Mr. George. They could have removed the vacuum truck and gotten that out of the way, which is where Mr. George was sitting. They could have waited until after hours. They could have used matting. All of those decisions were made by Veolia and not by SI Group. And SI Group did not retain under the contract the ability to make that decision or to impose that onto Veolia. And why didn't it? Because it was outside the scope of its work. There was no reason for Veolia to drop the trailer other than the fact that its tractor broke down. It didn't need to ever drop that trailer in the gravel. The only place it ever dropped the trailer was across the tank farm where it was paved, where it refilled the water and switched them out. That area was paved. So the only thing contemplated by the scope of work was to switch the trailer and drop the trailer on concrete, which is safe, which actually, according to Veolia's own safety representative, they would still use matting in that situation. That was Veolia's policy. And there was no actual control because specifically it wasn't staging. Generally telling somebody where to park is not actually exercising control over the specific activity that happened here. Redinger is actually an example of a case in which staging was at issue because two contractors were told to be in the same area basically working on top of each other. And that's what caused the incident. With 10 seconds left, I'm not hearing anything about a leak from you and virtually didn't hear anything about a leak from opposing counsel. So the leak issue is just not relevant to this case? That's because a leak doesn't matter because that trailer would have tipped whether there was a leak or not because it was dropped where it wasn't supposed to be dropped and without taking any safety precautions. And if there aren't any further questions, vote. Okay, thank you. We'll now hear from your colleague, Christina Williams, for the Brenner Tank Services. May it please the Court, Christina Williams on behalf of Apple Use Brenner Tank Services and Bulk Solutions. The District Court correctly granted summary judgment on Georgia's claims against Brenner and Bulk for two primary reasons. First, Bulk is entitled to summary judgment as a matter of law as a non-manufacturing seller. Second, George failed to raise a genuine issue of material fact as to each element of his failure to warn and design defect claims against both Brenner and Bulk. So this Court should affirm the District Court's order granting summary judgment. Turning to my first point, the District Court correctly found that Bulk is entitled to summary judgment as a matter of law as a non-manufacturing seller. So George does not challenge this ground on appeal in its briefing. He takes no issue at oral argument. So because the summary judgment ground is uncontested, this Court can affirm as to Bulk and dismiss the claims against it. I was going to ask you about that. So we don't talk about Bulk, but we're still talking about Brenner Tank. Yes, that's correct. So as to Brenner, the District Court correctly found that George failed to raise a genuine issue of material fact on each element of his product liability claims. And of course, if the Court in writing the opinion were to disagree on the non-manufacturing seller, this would apply equally to Bulk as well. So turning first to the failure to warn claim, the District Court properly held that Brenner owed no duty to warn. So when we look at whether someone has a duty to warn under Texas law, we look at what the ordinary user of the product already knows. And if the manufacturer has some special knowledge that is beyond the common and ordinary knowledge of the user, then there's a duty to warn. Here, there's simply no duty to warn as a matter of law because the record shows that the ordinary user of the tanker trailer, someone who is licensed to drive a commercial vehicle and has a CDL, understands the risk of unsteady ground and that the common practice is to use boards and mats. And that simply wasn't followed here. So the ordinary user, foreseeable user, takes into account specialized knowledge? Absolutely, it does. So this is not a coffee cup at McDonald's situation, right, where any member of the public can buy the coffee cup. The user of the tanker trailer is not myself or any other average member of society. It is somebody with a CDL license. And here we know that Armstrong, the user and driver of this vehicle, certainly should have known of the risk. We can first look to his CDL training that he did about eight months before. The risk of uncoupling and then leaving on ground as opposed to concrete without matting? Is that sort of the equation? Absolutely. So the CDL handbook stresses the importance of not only assessing the ground before you uncouple a trailer, but even go so far as to describe how you test the ground to ensure it is going to support this massive trailer. But any of the three would interrupt the accident. Don't uncouple, use concrete, and the third, use mats. Yes, that's correct. Any of those would interrupt the causal chain. So we also can look at the practice of the Viola users of this product and tankers trailers in the industry. I'd point the court to pages 98-43 through 45, 98-57 and 98-93 that shows that everyone at Viola knew to use these boards and mats. They knew of the danger. They also used them with smaller vehicles, their own personal vehicles, much smaller than the tanker here at issue. So all of that shows that the ordinary user knows of the exact risk here that they're seeking a warning about. So there's no additional duty to warn as a matter of law. So that will just go dispose of the failure to warn claim. Then turning to the design defect, if the court has no further questions on failure to warn, one thing I want to note is that my friend on the other side stressed the district support, the district court's opinion was based on causation. And it was, but as the court knows, it can affirm summary judgment on any ground. So not only was the court correct on causation because the overwhelming evidence in the record was that this accident was caused by the failure to follow industry practice to assess an unsteady ground and use blocks and mats, but it was not the substantial factor the way it was designed because even had these warnings been given, they simply wouldn't made a difference because the warnings that they're asking for, say to test the ground strength and essentially don't use it on unsteady ground. Here they assess the ground, they determined it was steady enough and they used it. So there's no causation. But independently, the design defect claim also fails because there's no genuine issue of material fact that the tanker trailer was defectively designed to render it unreasonably dangerous. Instead, all factors point against the finding that the tanker trailer's landing here was unreasonably dangerous. First, the tanker trailer was designed for road use. Texas law is clear that you do not have an obligation to design your product for every foreseeable possible use. Instead, you design your product for an intended use and you have an obligation to make sure it's not unreasonably dangerous in that use. And I'd point the court to the Caterpillar case, which we haven't heard much about today and they don't address in their reply brief. But in that case, we have a Caterpillar vehicle that has a roller cover at the top so that an individual can roll it under and access something in a low-hanging thing. And everybody knew of the danger of using the Caterpillar vehicle without this cover. And the Texas Supreme Court held that there was no obligation to design it any differently because, first of all, the risk was known. But had the product, it was simply impossible to design the product differently with the cover and it still fit under the spaces. So here, what they're asking for is they're asking to fundamentally change the design of the product when the testimony in the record shows that essentially the industry is already taking care of a safe alternative use of the product when it's used off-road as it's not intended. The industry uses boards and mats and their expert, you know, offers alternative use of what could be but the district court correctly found that that was not supported by the expert's opinion. Would we be asking whether any reasonable juror could say that the design defect was a substantial factor in this accident? And your answer would be no because it was on gravel, no because mats weren't used? Correct. Am I framing it correctly? Right. The question is can any reasonable juror not only find causation but that there is a safer alternative design and it's unreasonably dangerous and they fail on all three grounds. Okay. So as to the safer alternative design, they point to their expert opinions but the district court correctly concluded that those were not credible summary judgment evidence to support the conclusion and the easiest ground for the court to reach that on is the expert opinion doesn't address the feasibility of redesigning this product or the economic impact. What they point to in their summary judgment briefing is an excerpt of a deposition that is very conclusory. Is it feasible? Yes. How do I know industry experience? And that's simply not enough to create a genuine issue of material fact to show a safer alternative design. One thing we haven't mentioned today is, you know, we talked Judge Higginson noted that even George's experts recognize that the cause is the failure to use the blocks and mats but they go further. When George's expert is asked what he would tell people about how to design a trailer that could go on road and off road, he says he would tell them to use blocks which is already the industry practice. So there's no safer alternative shown by the expert. So for these reasons their design defect claims fail as well. So if the court has no further questions, I'd ask that the court affirm the district court's orders granting some judgment and dismissing claims against Brenner and Dalk. Okay. Thank you. Thank you. And we'll now hear the rebuttal. Thank you, Your Honor. Just a few quick points. First of all, we talked about whether this is a Category 1 or Category 2 case. The evidence on Category 2 case is exactly what you said. Whether the definition of an unreasonable risk is a pre-existing condition that it was with a sufficient probability of harm that a reasonably prudent person would have foreseen. The evidence is that Mr. Hall, who is in charge of safety at SI, foresaw this risk. So this is a Category 1 incident because it was foreseeable that they would stage trailers there. But it's also a Category 2 incident because of the issue of control. And what they, the question on control is whether they had the power to forbid VIOLA from uncoupling on the gravel, which they absolutely did, or they had the power to require them to use matting, which they absolutely did. If you look at what the permit says, it says specifically that the SI group has control over activities taking place, and that SI group is responsible to determine that the job will be performed will not pose an undue hazard. That's at 1438 of the record. They took, and what our expert testified to, is that under these permit documents, they took back control. So there may have been a delegation of some sort under the contract, but that delegation is actually limited to safety of the equipment. Safety of the facility is never delegated to VIOLA, and these permit documents put that responsibility squarely on SI group. A couple other quick points. Opposing counsel noted that she said, quote, everybody knows not to do this. Well, that's not the evidence in the case. Mr. Armstrong, who decoupled, testified he did not know to do this, and nobody ever told him that. That's at 3990. He also testified that he routinely, the majority of the time, including when working at SI group, decouples the trailers. And the only one tractor, and there's three trailers. So you are constantly uncoupling the trailers, and he said they always did it. The majority of the time they did that when they were on gravel, and that is at 3925 of the record. That is confirmed by Munoz, another person who did not know he couldn't do this, even though everybody knew apparently, at 3613 of the record. And what did Armstrong say, if anything, about if you do decouple on dirt or gravel, you should or shouldn't use blocks and mats? He said, as it relates to this specific situation, he said he looked at the ground, and the ground looked solid enough to him, so he dropped the trailer. So he said he did not know that he was supposed to put a mat. It never occurred to him that this would be unsafe. Skipping, and just the final point here is that opposing counsel said that the reason that this happened is because we dropped it somewhere we weren't supposed to, and that that's not a premises liability problem. Well, the only person who knew that we weren't supposed to drop there was SI group. Nobody at Viola who was involved knew. SI group did not warn us that this ground was strong enough to handle a trailer plus a tractor, but not strong enough just to handle a trailer. That was unique knowledge to SI group. They should have warned about it. Turning to the marketing defects, they don't have any response to the fact that the CDL training says nothing about matting or how to uncouple trailers. They just keep saying that the industry knows this, but they don't have any proof that the industry knows this, and this is their burden. All they point to is that Viola has some policies about this, but Viola is just one company, and as they said in their own brief, you know, the knowledge of one person isn't determinative. The fact that Mr. Armstrong didn't know about this isn't determinative. The question is whether this is known commonly in the industry to the extent that there is no duty as a matter of law. Usually that is things like the dangerous effects of alcohol, commonly known. Caterpillar is driving industrial equipment without a cage around you, commonly known. Whether dropping a trailer that can work fine on the ground when it's attached is something that is so dangerous that everybody just knows about it, that there's no evidence in the record that establishes that as a matter of law, and I don't think that falls into the category of obvious defects. The final point that I would make is that the warning that we're talking about here on the warning defect is that it says nothing. The proposed warning that we recommended on page 11.187 of the record addresses a specific issue. It talks about gravel and dirt specifically, which the other warnings do not, and talks about specifically the injuries, that the hazards that will occur if you do not follow the warning, which is what our expert testified is important. If there are no further questions, I'll yield the court should reverse and let us have our case back. Okay, we appreciate everybody's arguments and we'll now decide this case, and we have now concluded today's oral arguments in this panel. We will return tomorrow morning at 9 a.m.